

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**1:02CV 827**
**JUDGE O'MALLEY**
**MAG. JUDGE BAUGHMAN**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| Plaintiff, | : Case No. |
| | : Judge |
| v. | : |
| EDWARD FRUCHTENBAUM | : COMPLAINT |
| 255 Grey Fox Run | : |
| Chagrin Falls, OH 44022 | : |
| Defendant | : |

Plaintiff Securities and Exchange Commission ("Commission") alleges the following:

1. On December 21, 1998, Edward Fruchtenbaum ("Fruchtenbaum"), then the President and Chief Operating Officer ("COO") of American Greetings Corporation ("American Greetings" or the "company"), exercised options to purchase 30,000 shares of American Greetings stock at prices ranging from $19.25 to $29.50 per share. He immediately sold those 30,000 shares at prices ranging from $40.00 to $41.63 per share. At the time of his trades, Fruchtenbaum knew that American Greetings was expecting a significant earnings shortfall for

its upcoming fiscal year and that American Greetings was going to implement a new inventory system, which would significantly reduce revenues in the upcoming fiscal year. Two months after Fruchtenbaum's trades on February 24, 1999, the company publicly announced the implementation of the new inventory system, the revenue reduction and the corresponding earnings reduction for its upcoming fiscal year. The day of the announcement, American Greetings common stock fell 32% from $35.06 to $23.875. By trading in advance of the company's announcement, Fruchtenbaum profited by approximately $490,625 more than he would have had he waited to trade until after the February 24, 1999 announcement.

2. Fruchtenbaum, directly and indirectly, has engaged and, unless enjoined, will continue to engage in transactions, acts, practices, and courses of business which constitute and will constitute violations of Sections 17(a)(1), 17(a)(2) and 17(a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77q(a)(1), §77q(a)(2), and §77q(a)(3)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78j(b)], and Rule 10b-5 [17 C.F.R. §240.10b-5] promulgated thereunder.

3. The Commission brings this action pursuant to Section 20(b) of the Securities Act [15 U.S.C. §77t(b) and Sections 21(d) and 21A of the Exchange Act [15 U.S.C. §§78u(d) and 78u-1] for an order permanently restraining and enjoining Fruchtenbaum, ordering disgorgement of unlawful profits, imposing civil penalties, prohibiting Fruchtenbaum from acting as an officer or director of any reporting company, and for other relief.

**JURISDICTION AND VENUE**

4. The Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(e) and 78aa].

2

5. Fruchtenbaum, directly and indirectly, has made use of the means and instruments of transportation and communication in interstate commerce, of the means and instrumentalities of interstate commerce, of the mails, and of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged herein within the jurisdiction of the Northern District of Ohio and elsewhere.

### THE DEFENDANT

6. Fruchtenbaum, age 54, resides in Chagrin Falls, Ohio. At all times relevant to this Complaint, Fruchtenbaum was President and COO of American Greetings and also served as the President of American Greetings' U.S. Greeting Card Division, the company's largest business unit. In his positions, Fruchtenbaum supervised the income-generating operating units of American Greetings. Fruchtenbaum was employed by American Greetings from 1973 until his termination on June 23, 2000.

### ENTITY INVOLVED

7. At all relevant times, American Greetings was an Ohio corporation with its principal offices located in Cleveland, Ohio. American Greetings develops, manufactures and markets greeting cards. American Greetings' common stock is registered with the Commission pursuant to Sections 12(b) and 12(g) of the Exchange Act [15 U.S.C. §§ 78l(b) and 78l(g)]. Its common stock is listed on the New York Stock Exchange.

8. At all relevant times, American Greetings had a policy which prohibited all directors, officers and employees who possessed material, non-public information relating to American Greetings from trading American Greetings securities. The company's policy also provided that officers could only trade the company's stock during certain "windows" of time. Generally, those windows opened after the company made its quarterly earnings announcements

3

and lasted three to four days. American Greetings' policy further required that the company's officers obtain the approval of the company's General Counsel before they could trade the company's securities.

## FRUCHTENBAUM'S FRAUDULENT SECURITIES TRANSACTIONS

9. American Greetings' fiscal year ends at the end of February. At all times relevant to this Complaint, American Greetings' senior managers prepared three-year business plans for the company. Each three-year plan set the financial goals for the company, including income, cost and earnings goals for the three fiscal years covered by the plan. The company's senior managers also prepared an annual business plan for each fiscal year, which included financial strategies and initiatives that management used to achieve the financial goals set for that year by the three-year plan.

10. Fruchtenbaum was deeply involved in preparing both American Greetings' three-year business plans and its annual business plans.

11. As the President of the U.S. Greeting Card Division, Fruchtenbaum directed that division's planning and made or approved the key decisions affecting the division's goals. As the President and COO of the entire company, Fruchtenbaum reviewed the plans and goals of all of the company's operating units. Together with the other senior managers of the company, Fruchtenbaum integrated the operating units' plans and goals into a unified plan and set of goals for the entire company.

4

## **Fruchtenbaum Knew That American Greetings Expected an Earnings Shortfall and a $100 Million Drop in Revenue for Fiscal Year 2000**

12. Fiscal year 2000, which began on March 1, 1999, was the third year in a three-year plan that began with fiscal year 1998. The company's senior managers, including Fruchtenbaum, began developing the annual business plan for fiscal year 2000 in October 1998.

13. The business plan prepared by the company's senior managers for fiscal year 2000 projected that American Greetings' earnings for fiscal year 2000 would be $243.3 million. This projected amount was $114.4 million less than the $357.7 million projected for fiscal year 2000 in the three-year plan. The projected revenue for fiscal year 2000 was also materially less than the $292.4 million of earnings that American Greetings had reported for fiscal year 1998 and the $281.6 million of earnings it eventually reported for fiscal year 1999.

14. The business plan for fiscal year 2000 projected earnings per share ("EPS") of $2.00, or $0.85 less than the $2.85 per share called for by the three-year plan. The projected EPS for fiscal year 2000 were also materially less than the $2.58 EPS reported for 1998 and the $2.56 EPS eventually reported for 1999.

15. In their planning for fiscal year 2000, Fruchtenbaum and the company's other senior managers predicted as early as November 1998 that earnings in fiscal year 2000 would be materially below prior expectations.

16. In prior years, when faced with a projected earnings shortfall, American Greetings' senior managers had acted to reduce expenses and to take other strategic initiatives in order to increase earnings. However, in planning for fiscal year 2000, the company's senior managers followed a different course of action.

5

17. As early as November 1998, the company's Chief Executive Officer ("CEO") informed Fruchtenbaum and other senior managers that he wanted to implement a new, just-in-time inventory system for American Greetings during fiscal year 2000. This new inventory system would benefit American Greetings in the long run by reducing the company's high inventory levels. However, as Fruchtenbaum and the senior managers knew, implementing the new inventory system would also reduce revenues in fiscal year 2000, in addition to the earnings shortfall they were already projecting. Any steps American Greetings might take to reduce the projected earnings shortfall in fiscal year 2000 would largely be offset by the revenue reduction caused by implementing the new inventory system.

18. In November 1998, the CEO, Fruchtenbaum and other company officials discussed that implementing the new inventory system would reduce fiscal year 2000 earnings by $0.60 to $1.00 per share. This would be a material reduction in earnings.

19. During November and December 1998, Fruchtenbaum took part in discussions with the CEO, the Chief Financial Officer ("CFO"), the General Counsel and other company officials, in which they discussed implementing the new inventory system, even though doing so would significantly reduce revenues in fiscal year 2000, and by late December 1998, the company's senior managers knew that the implementation of the new inventory system would result in a $100 million reduction in revenues for fiscal year 2000.

**Fruchtenbaum's Trades**

20. In November 1998, Fruchtenbaum held exercisable options to purchase 30,000 shares of American Greetings common stock at prices ranging from $19.25 to $29.50 per share, significantly below its then current market price.

21. In late November, Fruchtenbaum instructed his secretary that when the next trading window opened on December 21, 1998, he wanted to exercise all of his available options to purchase 30,000 American Greetings common stock and then immediately sell that stock. Fruchtenbaum instructed his secretary to make arrangements for the trades. When Fruchtenbaum gave these instructions to his secretary, he already knew about the projected earnings shortfall and had already begun discussions with the CEO and others about implementing the new inventory system.

22. Fruchtenbaum's secretary contacted the Manager of Treasury Operations ("Manager") to set up a meeting between Fruchtenbaum and the Manager to talk about Fruchtenbaum's available options and the procedures for exercising those options. At that meeting in late November, the Manager informed Fruchtenbaum that before the trades could be initiated, Fruchtenbaum had to follow company policy and ask the General Counsel if it was permissible for him to make the proposed trades at that time.

23. In mid-December 1998, Fruchtenbaum told the company's General Counsel about his plan to trade on December 21, 1998. The General Counsel told Fruchtenbaum that he should not trade on December 21, 1998. The General Counsel believed that Fruchtenbaum would be violating the company's insider trading policy if he traded at that time because of the material inside information that Fruchtenbaum possessed about the company's financial situation.

24. Shortly after his meeting with Fruchtenbaum, the General Counsel met with the CFO to discuss Fruchtenbaum's proposed trades.

25. Soon thereafter, the General Counsel and the CFO met with the CEO and told the CEO about Fruchtenbaum's plan to trade American Greetings securities. They urged the CEO to

tell Fruchtenbaum not to trade. The CEO agreed with the General Counsel's opinion that Fruchtenbaum should not trade, given his knowledge of the company's financial situation.

26. After this meeting, the CEO met with Fruchtenbaum and told him that he thought it was inappropriate for him to trade and that he should follow the General Counsel's guidance not to trade.

27. Despite the General Counsel and CEO's disapproval of his trades, on December 21, 1998 Fruchtenbaum exercised all of his available options and purchased 30,000 shares of American Greetings stock. He immediately sold those shares on December 21, 1998 at their market price of $40.00 to $41.63 per share.

28. Of the options available to Fruchtenbaum in December 1998, he had options to purchase 4,500 shares of Class A American Greetings stock, and 25,500 shares of Class B American Greetings stock. American Greetings Class A shares were traded publicly. Fruchtenbaum purchased 4,500 Class A shares at $29.50 and immediately sold the shares at prices ranging from $41.50 to $41.625. Only American Greetings employees could hold Class B shares. Fruchtenbaum purchased 25,500 Class B shares at prices ranging from $19.25 to $27.25 on December 21, 1998 and immediately sold the shares back to the company for $40 per share.

28. At the time Fruchtenbaum exercised his options, bought 30,000 shares of American Greetings common stock and immediately resold those 30,000 shares, he knew that the company's senior managers were projecting a material earnings shortfall for fiscal year 2000, that the company's CEO was promoting a plan to implement a new inventory system, and that implementing the new inventory system would reduce revenues in fiscal year 2000.

29. Fruchtenbaum did not inform the CEO, the General Counsel, or the CFO that he was proceeding with the trades, despite the CEO and General Counsel's disapproval. The CEO,

8

the CFO and the General Counsel did not learn that Fruchtenbaum had made the trades until later, when they received notification that the trades had been completed.

30. In order to effect his trades, Fruchtenbaum signed a Cashless Stock Exercise Form for the Class A shares on December 18, 1998 and, after the fact, signed Same-Day Sale Forms for the Class B shares on December 22, 1998. At no time did Fruchtenbaum inform the American Greetings employees who processed his trades that the CEO and the General Counsel had not approved of the trades.

31. Before he sold his Class A shares on December 21, 1998, Fruchtenbaum did not publicly disclose the fact that the senior managers were projecting an earnings shortfall for fiscal year 2000 or that the CEO was promoting a plan to implement a new inventory system, which would reduce fiscal year 2000 revenues.

32. On February 24, 1999, American Greetings publicly announced the new inventory system and the fact that the new system would reduce revenues in fiscal year 2000 by $100 million, which would reduce EPS to $2.00- $2.10. This figure was significantly below the $2.85 EPS the company had originally projected for fiscal year 2000 and the $2.97 that analysts had projected for the year. In addition, the projected EPS announced on February 24, 1999 were materially less than the EPS of $2.58 reported in 1998 and than the EPS of $2.56 eventually reported for fiscal year 1999. On February 24, 1999, the price of American Greetings common stock declined approximately 32% from $35.06, the closing price on February 23, 1999, to $23.875.

33. By exercising all of his 30,000 options and immediately selling the resulting shares on December 21, 1998, Fruchtenbaum profited by approximately $490,625 more than he would have earned if he had delayed his trades until after the February 24, 1999 announcement.

9

34. Through the actions alleged above, Fruchtenbaum engaged in manipulative and deceptive conduct in the offer and sale and in connection with the purchase and sale of securities. By his conduct in trading his Class A shares, Fruchtenbaum breached his fiduciary duty or similar duty of trust and confidence to American Greetings and its shareholders not to use confidential information regarding the earnings shortfall and new inventory system, and its corresponding revenue reduction, for his personal benefit. At the time of his trades, Fruchtenbaum knew, or was reckless in not knowing, that the information he possessed about the earnings shortfall, the new inventory system and the revenue reduction was confidential and that trading for his own benefit while using that information was a breach of fiduciary duty or similar duty of trust and confidence that he owed to American Greetings and its shareholders.

35. Through the actions alleged above, when he used material, nonpublic information in trading his Class B shares, Fruchtenbaum knowingly or recklessly deceived American Greetings. He concealed from the CEO and the General Counsel his intention to proceed with his planned trades without their approval, and he concealed from the employees who processed the trades that the CEO and General Counsel had not approved of his trades. Through his conduct, Fruchtenbaum breached his fiduciary duty or similar duty of trust and confidence that he owed to American Greetings and its shareholders.

### COUNT I
### Violations of Section 17(a)(1) of the Securities Act
### [15 U.S.C. §77q(a)(1)]

36. Paragraphs 1 through 35 are realleged and incorporated by reference herein.

37. By the conduct alleged above, Fruchtenbaum, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly, employed devices, schemes or artifices to defraud.

38. Fruchtenbaum acted with scienter when he engaged in the conduct alleged in Paragraphs 9 through 35 above.

39. By reasons of the activities alleged in Paragraphs 9 through 34 above, Fruchtenbaum violated Section 17(a)(1) of the Securities Act [15 U.S.C. §77q(a)(1)].

## COUNT II

### Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §77q(a)(2)]

40. Paragraphs 1 through 35 are realleged and incorporated by reference herein.

41. By the conduct alleged above, Fruchtenbaum, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly, obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading and engaged in transactions, practices or courses of business which would and did operate as a fraud or deceit upon purchasers and prospective purchasers of such securities.

42. By reasons of the activities alleged in Paragraphs 9 through 35 above, Fruchtenbaum violated Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§77q(a)(2) and 77 q(a)(3)].

## COUNT III

### Violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] promulgated thereunder

43. Paragraphs 1 through 35 are realleged and incorporated by reference herein.

44. By the conduct alleged above, Fruchtenbaum, in connection with the purchase and sale of securities by the use of the means and instrumentalities of interstate commerce, by the use

of the mails, and by the use of the facilities of a national securities exchange, directly and indirectly: employed devices, schemes, and artifices to defraud; made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of business which would and did operate as a fraud and deceit upon the purchasers and sellers of such securities.

45. Fruchtenbaum acted with scienter when he engaged in the conduct alleged in Paragraphs 9 through 35 above.

46. By reason of the activities alleged in Paragraphs 9 through 35 above, Fruchtenbaum violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] promulgated thereunder.

## PRAYER FOR RELIEF

**THEREFORE,** the Commission respectfully requests that this Court:

### I.

Issue findings of fact and conclusions of law that Fruchtenbaum committed the violations charged and alleged herein.

### II.

Permanently enjoin Fruchtenbaum from violating Sections 17(a)(1), 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §77q(a)(1), §77q(a)(2), and §77q(a)(3)].

### III.

Permanently enjoin Fruchtenbaum from violating Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] promulgated thereunder.

IV.

Order Fruchtenbaum to pay to the registry of this Court disgorgement of his ill-gotten gains from his illegal conduct, gained directly or indirectly from the transactions complained of herein, in the amount of $490,625, together with prejudgment interest thereon.

V.

Order Fruchtenbaum to pay to the Commission a civil penalty pursuant to Section 21A of the Exchange Act [15 U.S.C. §78u-1].

VI.

Order Fruchtenbaum barred from acting as an officer or director of any issuer whose securities are registered pursuant to Section 12 of the Exchange Act [15 U.S.C. §78l] pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. §78u(d)(2)], as a result of his violation of Section 10(b) of the Exchange Act [15 U.S.C. 78j(b)] and Rule 10b-5 [17 C.F.R. 240.10b-5] thereunder.

VII.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VIII.

Grant an Order for such further relief as the Court may deem appropriate.

Dated: May 1, 2002

Respectfully submitted,

John E. Birkenheier
Illinois Bar No. 6270993

Lacey C. Sikora
Illinois Bar No. 6269489

Attorneys for Plaintiff
United States Securities and Exchange Commission
175 West Jackson Boulevard, Suite 900
Chicago, Illinois 60604
Telephone: (312) 353-7390
Facsimile: (312) 353-7398
birkenheierj@sec.gov (e-mail)

Local Counsel

Steven J. Paffilas
Ohio Bar No. 0037376
Office of the U.S. Attorney
1800 Bank One Center
600 Superior Avenue East
Cleveland, Ohio 44114-2600
Telephone: (216) 622-3698
Steven.Paffilas@usdoj.gov (e-mail)